IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>BARBARA MADIGAN,<br><br>Defendant. | CV 15-19-BU-BMM-JCL<br><br>FINDINGS &<br>RECOMMENDATION |

This matter comes before the Court on Plaintiff United States of America's Motion for Summary Judgment as to Count II of the Complaint. For the reasons set forth below, the motion should be granted.

I. **Background**[1]

Barbara Madigan ("Madigan") married Mark Phillips ("Phillips") in 1968. On September 21, 1975, Madigan and Phillips had a son, Steven D. Phillips ("Steven"). While still an infant, Steven became ill with meningitis and developed

---

[1] The following facts are undisputed, and are taken from the parties' Joint Statement of Stipulated Facts (Doc. 9) as well as the United States' Statement of Undisputed Facts (Doc. 17).

disabilities that continue to the present.

In 1979, Phillips fled the United States to avoid prosecution for federal drug trafficking charges. Several years passed, and in November 1990 Madigan filed a petition in the Circuit Court for Broward County, Florida, seeking to have Phillips declared dead. During those proceedings, Madigan filed an affidavit declaring that she had no information regarding Phillips' whereabouts since November 1979. On November 14, 1990, the Florida court entered an order declaring Phillips dead as of November 5, 1984.

Approximately one month after Phillips was declared dead, Madigan filed for surviving child benefits from the Social Security Administration (SSA) on behalf of Steven. Effective December 1990, Madigan was awarded benefits as representative payee on Steven's behalf. Steven, who was still a minor at the time, qualified for benefits only because Phillips was allegedly deceased. As a representative payee, Madigan had an ongoing obligation to report to the SSA any information that might change Steven's entitlement to SSA surviving child benefits.

Once Steven turned 19 and was no longer a full-time student, he was eligible to continue receiving benefits as a disabled adult child after receiving a medical evaluation confirming his disability. Because he had not worked enough

at that time to qualify for benefits based on his own record, Steven continued to receive benefits based on Phillips' work record. The only basis on which the SSA ever determined that Steven was eligible for benefits was SSA's belief that Phillips was deceased.

By April 1996, Steven had worked enough to qualify for benefits on his own social security disability record. He became eligible to start receiving those benefits in September 1996, after serving the required five-month waiting period. Before becoming eligible based on his own record, Steven had received $52,884.40 in surviving child benefits through August 1996. Although Steven qualified for disability benefits on his own record as of September 1996, those payments would have been substantially lower than his surviving child benefits. Thus Steven elected to continue to receive benefits based on Phillips' work history until 2010.

In the meantime, Madigan learned no later than 2002 that Phillips was still alive. Madigan never reported this information to the SSA. Between February 2003 and February 2010, Madigan signed and submitted five Representative Payee Reports listing Phillips' social security number as the social security number for the claim. Additionally, in 2008 Madigan signed a work activity report which listed Phillips as the wage earner. According to Madigan, she signed

and submitted these forms without reading them and was unaware that after 1994, Steven's disability benefits were still linked to Phillips.

Phillips was eventually discovered living in Chile, and was repatriated to the United States in April 2010. In June 2010, the SSA notified Steven that he did not qualify for surviving child benefits because Phillips was still alive. By the time his surviving child benefits terminated in July 2010, Steven had received $75,881 more in benefits than he would have received on his own record.

The SSA calculated that Madigan received a total of $208,075.70 in survivor benefits on Steven's behalf to which she was not entitled because Phillips was not deceased. On August 14, 2010, the SSA sent a Notice of Change in Benefits to Steven informing him of the overpayment and requesting payment. Neither Madigan nor Steven has repaid any of the benefits.

In May 2015, the United States commenced this action to recover the overpayment pursuant to the False Claim Act, 31 U.S.C. § 3729(a) (Count I) and based on the common law theory of payment by mistake (Count II). The United States moves for summary judgment on its common law claim of payment by mistake, and seeks judgment as a matter of law in the amount of $128,765.40. This amount represents the $208,075.70 overpayment less the amount Steven could have received on his own record. The United States is thus seeking to

recover the $52,884.40 in mistaken payments made before Steven was eligible on his own record, plus the overpayment of $75,881 after he was eligible but still receiving benefits as a surviving child, for a total of $128,765.40.

## II.　Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may

5

not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

### III. Discussion

The United States argues it is entitled to judgment as a matter of law to recover the surviving child benefits paid to Madigan, as representative payee for her son Steven, based on the erroneous and material belief that Phillips was deceased. For support, the United States relies on Ninth Circuit authority establishing that the government can recover payments made by mistake under a common law cause of action without showing fault on the part of the recipient. *U.S. v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970); *Fort Belknap Housing Dept. v. Office of Public and Indian Housing*, 726 F.3d 1099, 1105 (9th Cir. 2013).

In *Mead,* for example, the defendant contractor built conservation projects on several farms. *Mead,* 426 F.2d at 120. Under an agricultural conservation

program, the federal government would pay a percentage of the "cost price" for the work. *Mead*, 426 F.2d at 120. When the contractor submitted his claims however, he incorrectly requested reimbursement based on the market value of each project, which was higher than the "cost" he charged the farmers. *Mead*, 426 F.2d. at 120. The government brought suit to recover the overpayments under the False Claims Act, or, in the alternative based on a common law theory of mistaken payment. *Mead,* 426 F.2d at 121.

The Ninth Circuit concluded that the government could not recover under the False Claims Act because it had not shown that the contractor intended to defraud the government. *Mead,* 426 F.2d at 124. But the court held the government could recover under its alternative theory of mistaken payment. *Mead,* 426 F.2d at 124-25. The court reasoned that the contractor submitted technically incorrect claims which the government materially relied on in its decision to provide payment. *Mead,* 426 F.2d at 124. Because "[k]nowledge of falsity is not a requisite for recovery under the mistake doctrine," the court found that the contractor was liable to the government for the overpayments even though he was not intentionally deceptive. *Mead*, 426 F.2d at 125 n.6. The court concluded that the government was entitled to recover because it made the "payments under an erroneous belief which was material to the decision to pay."

*Mead*, 426 F.2d at 124. *Mead* thus stands for the proposition that the government can recover under the common law doctrine of payment by mistake if it made payments under an erroneous belief that was material to the decision to pay, regardless of whether the recipient was at fault. *Mead*, 426 F.2d at 124-25.

In *Fort Belknap*, the Ninth Circuit reaffirmed that the government has a common law right to recover "payments made under an erroneous belief which was material to the decision to pay," even if the payments were made due to an unintentional mistake on the part of the recipient. *Fort Belknap*, 726 F.3d at 1105. The plaintiff tribal housing association in *Fort Belknap* filed inaccurate statements as part of a housing subsidy program and received more than $2 million in overpayments. *Fort Belknap*, 726 F.3d at 1103. The Ninth Circuit held the governmental agency could recover the amount of overpayment to the tribe based on the doctrine of payment by mistake. *Fort Belknap*, 726 F.3d at 1105. The court found the tribe had been overpaid because of the government's mistaken belief, based on the tribe's inaccurate statements, that various housing units were eligible for subsidies. *Fort Belknap*, 72 F.3d at 1105. As in *Mead*, the government was entitled to recover because it made the payments under an erroneous belief that was material to the decision to pay. *Fort Belknap*, 726 F.3d at 1105. *See also Grand Trunk Western Ry. Co. v. U.S.*, 252 U.S. 112, 121-22

(1920) (holding railway company liable for overpayments on its federal mail contracts, even though there was no evidence that the company knew it was being overpaid); *U.S. v. Bellicci*, 2008 WL 802367 *4 (E.D. Cal. March 26, 2008) (citing *Mead* for the proposition that "[t]he United States may recover payments made under an erroneous belief that was material to the decision to pay, even if the payments were innocently received.").

Here, the government is entitled to recover the overpayments it made to Madigan on Steven's behalf because the undisputed facts demonstrate that it made the "payments under an erroneous belief which was material to the decision to pay." *Mead*, 426 F.2d at 124. It is undisputed that from December 1990 until July 2010, Steven received benefits on the basis of his status as a surviving child of his allegedly deceased father, Phillips. It is further undisputed that Madigan was Steven's representative payee during that entire period, and accepted surviving child benefits on his behalf. The SSA's mistaken belief that Phillips was deceased was necessarily material to its decision to pay surviving child benefits to Madigan on Steven's behalf because Steven was not statutorily eligible to receive the benefits unless he had a deceased parent. *See* 42 U.S.C. § 402(d)(1). Because the United States is entitled recover payments made under an erroneous belief which was material to the decision to pay even if the payments were innocently received,

the fact that Madigan claims she did not know Phillips was alive until 2002 is immaterial.

To the extent Madigan maintains the government is not entitled to recover the overpayments because she did not know Steven's benefits were still based on Phillips' record once Steven became an adult, and did not intentionally mislead the SSA, her argument is unavailing. As a representative payee, Madigan was required by regulation to "[n]otify [SSA] of any event or change in your circumstances that will affect the amount of benefits you receive, your right to receive benefits, or how you receive them." 20 C.F.R. § 404.2035(d). Although Madigan claims she was unaware of any such obligation, she "is imputed with full knowledge of the statutory and regulatory requirements for maintaining ... eligibility" for benefits "regardless of her actual knowledge. *United States v. Bellecci*, 2008 WL 802367 *5 (E.D. Cal. March 26, 2008). Moreover, as set forth above, the Ninth Circuit has made clear that recovery is appropriate "even if the payments were innocently received." *United States v. Bellicci*, 2008 WL 802367 (E.D Cal. Mar. 26, 2008) (citing *Mead,* 426 F.2d at 124).

Madigan's primary argument in response to the United States' motion is that she is a representative payee who did not misappropriate any benefits, and so cannot be held liable for overpayments. This argument fails in light of Ninth

10

Circuit precedent. Under the majority view adopted by the Ninth Circuit, a representative payee can be held liable for overpayments. *Evelyn v. Schweiker*, 685 F.2d 351, 352 (9th Cir. 1982).

In *Evelyn,* a representative payee challenged an SSA decision to terminate disability payments to her son. *Evelyn*, 685 F.2d at 351-52. The payee had the option to suspend payments during the challenge, but chose not to. *Evelyn,* 685 F.2d at 352. When the Appeals Council of the Department of Health and Human Services upheld the termination, the government sought to collect the overpayments under 42 U.S.C. § 1383. *Evelyn,* 685 F.2d at 352. The representative payee argued that because the statute did not specifically authorize collection of overpayments from a representative payee, she could not be held liable. *Evelyn*, 685 F.2d at 352. The Ninth Circuit disagreed however, reasoning that: "The representative merely stands in the shoes of the beneficiary. Just as the beneficiary could not keep the overpayment, neither can the representative payee." *Evelyn*, 685 F.2d at 352.

While the holding in *Evelyn* relied on the court's interpretation of 42 U.S.C. § 1383, the reasoning applies to representative liability more generally. Unlike in *Evelyn* where the Government sought to recover overpayments through a statutorily prescribed administrative procedure, here the government is pursuing a

common law cause of action. However, like the representative payee in *Evelyn*, Madigan "stands in the shoes of the beneficiary," and cannot keep any overpayments made to her on Steven's behalf. *See also*, *Hutchison for Hutchison v. Chater*, 99 F.3d 286, 288 (8th Cir. 1996) (upholding a portion of a judgment which made the representative payee liable for overpayment of disability benefits to her son); *Abrams v. Schweiker*, 543 F. Supp. 589, 592 (N.D. Ga. 1982) (holding that "recovery against a representative payee [is] proper"); *Dvorak v. Weinberger*, 456 F. Supp. 1398, 1399 (N.D. Ill. 1975) (holding a representative payee liable for overpayment of social security benefits because "payment to the representative is payment to the recipient"); *Corr for Corr v. Sullivan*, 725 F. Supp. 413, 414 (N.D. Ind. 1989) ("[W]here a statute provides for payments to a beneficiary's representative, the court may reasonably infer that Congress also intended for recovery from that representative of any *over*payments.").

Because the undisputed facts establish that the SSA paid child survivor benefits to Madigan on Steven's behalf based on the erroneous and material belief that Phillips was deceased, the United States is entitled to recover "that portion of the total of the payments which was made by mistake." *Mead*, 426 F.3d at 124. The United States is entitled to judgment as a matter of law in the amount of $128,765.40.

## IV. Conclusion

For the reasons forth above,

IT IS RECOMMENDED that Plaintiff United States of America's Motion for Summary Judgment as to Count II of the Complaint be GRANTED.

DATED this 24th day of June, 2016.

Jeremiah C. Lynch
United States Magistrate Judge